IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

CIVIL ACTION FILE NO. 7:21-cv-74

| | |
|---|---|
| JO ANNE SILVA, individually and on behalf of all others similarly situated,<br>Plaintiff,<br><br>v.<br><br>CONNECTED INVESTORS, INC.,<br>Defendant. | **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS** |

Defendant Connected Investors, Inc., by and through its undersigned attorneys, submits its Memorandum of Law in Support of Motion for Judgment on the Pleadings.

## INTRODUCTION

Plaintiff Jo Anne Silva registered for and participated in a webinar hosted by Defendant Connected Investors, Inc., during which she voluntarily submitted three different requests for further information from Connected Investors. Over the following days, Ms. Silva engaged in text and email conversations with employees of Connected Investors. Ms. Silva then informed Connected Investors that she no longer wanted to receive communications. Just hours after submitting her request to stop communications, but before Connected Investors was able to process the request, Ms. Silva received a prerecorded voicemail in response to one of her several

information requests. Now—only 26 days after receiving the prerecorded message—Ms. Silva brings a class action alleging that the prerecorded voicemail violated the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 *et seq*. She wishes to subject Connected Investors to a costly class action lawsuit over a single voicemail—that she requested—because it came mere hours after she submitted a request to stop communications. But the prerecorded voicemail did *not* violate the TCPA. Not only did Ms. Silva consent to and specifically request communications from Connected Investors, but Connected Investors is entitled to have a reasonable time within which to process stop requests before facing liability under the TCPA. Connected Investors is therefore entitled to judgment on the pleadings.

## STATEMENT OF FACTS

According to the Complaint, on March 31, 2021, Ms. Silva received a prerecorded voice message from Connected Investors on her cell phone. (Compl., D.E. 1, ¶¶ 22–23, 27). She contends that the message constituted telemarketing, as the message told her, in part, "to visit ConnectedInvestors.com/pin and enroll 'while she can still get all the bonuses.'" *Id.* ¶ 26. The website lists two account types available to Ms. Silva, both of which include "Everything Mentioned On The Webinar" and are offered at discounted prices. *Id.*

Ms. Silva then alleges that before receiving the prerecorded voicemail, she engaged in several text message conversations with different numbers belonging to

Connected Investors. *Id.* ¶ 31. Just hours before receiving the prerecorded voice message, Ms. Silva asked each of those numbers to stop sending her text messages. *Id.* Ms. Silva further alleges that a day and a half prior to receiving the prerecorded voicemail, she sent an email to one of Connected Investors' employees, stating: "I'm not ready 4 this now. Going thru divorce n legal issue[.] Thanks 4 not texting, calling and emailing me for now." *Id.*

Ms. Silva brings a class action against Connected Investors, seeking injunctive relief and monetary damages. *Id.* ¶ 4. Specifically, she contends that the prerecorded voicemail she received violated the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 *et seq.*, because she had not given prior express written consent to receive prerecorded telemarketing messages from Connected Investors. *Id.* ¶¶ 3, 29, 49. She also contends that Connected Investors sent out similar prerecorded voicemails "to thousands of consumers" without their consent, and she brings this action on their behalf. *Id.* ¶¶ 34, 37.

Ms. Silva's Complaint, however, leaves out large swaths of undisputable, material facts that are known to Ms. Silva. A more complete timeline of the relevant facts is as follows:

On Sunday, March 28, 2021—just three days before receiving the prerecorded voice message—Ms. Silva registered for a webinar hosted by Connected Investors. (Ans., D.E. 11, ¶¶ 22, 29). On the registration webpage, Ms. Silva provided, among other things, her name, phone number, and an email address. *Id.* ¶ 29. The

3

registration page informed Ms. Silva that by clicking the "Register" button, "you submit your information to the webinar organizer, who will use it to communicate with you regarding this event and their other services." *Id.*

That same evening, Ms. Silva participated in the webinar. *Id.* At least three times during the webinar, Ms. Silva requested more information from Connected Investors. *Id.* First, webinar participants were asked to text "GIFT" to 910-778-7600 if they wished to receive free bonuses from Connected Investors. *Id.* Ms. Silva did so. *Id.* Next, participants were asked to text "OFFER" to that same number if they wished to receive additional content from Connected Investors. *Id.* Ms. Silva did so again. *Id.* In response, she received an automated text response that the webinar presenter, Ross Hamilton, "received your request & will reach out soon!" *Id.* ¶¶ 26, 29.

Lastly, at the end of the webinar, participants were given another option to receive further information and communications from Connected Investors. *Id.* ¶ 29. Participants who wished to opt in for more information were directed to complete a contact form on Connected Investors' website. *Id.* Ms. Silva went to the website and voluntarily requested information from Connected Investors by filling out the contact form. *Id.* Ms. Silva used the same phone number, but she chose to use a *different* email address, which caused a second account profile to be created for Ms. Silva. *Id.*

After the webinar ended, a member of Connected Investors' sales team, Lou Irizarry, reached out to Ms. Silva by text message and at the second email address. *Id.* Ms. Silva exchanged emails with Mr. Irizarry in which she expressed an interest in Connected Investors' services. *Id.*

As a result of Ms. Silva's registration and participation in the webinar, her two text message requests for further information during the webinar, and her submission of the contact form at the end of the webinar, she received text messages from three different numbers between Sunday, March 28, 2021, and Wednesday, March 31, 2021. *Id.* ¶ 31 Those three numbers were the automated webinar participation number; Mr. Irizarry's number; and the number of another sales team member, Junior Mendoza, who, in the confusion of Ms. Silva's two accounts, was also assigned to Ms. Silva. *Id.* On the evening of Tuesday, March 30, 2021, at approximately 7:32 p.m. PST—just two days after participating in the webinar and requesting additional information and communications—Ms. Silva texted the word "Stop" to Mr. Irizarry. *Id.*; (Compl., D.E. 1, ¶ 31). The following morning, Wednesday, March 31, 2021, at approximately 9:04 a.m. PST, Ms. Silva texted "Stop" to the automated webinar participation number. (Compl., D.E. 1, ¶ 31); (Ans., D.E. 11, ¶ 31). And two minutes later, at 9:06 a.m. PST, she texted "Stop" to Mr. Mendoza. (Compl., D.E. 1, ¶ 31); (Ans., D.E. 11, ¶ 31).

Less than two and a half hours later, at around 11:30 a.m. PST on Wednesday, March 31, 2021, Ms. Silva received her last telephone communication

5

from Connected Investors: the prerecorded voicemail that is at issue here. (Ans., D.E. 11, ¶ 31). The prerecorded message, sent from Ross Hamilton through the automated webinar participation number, was Connected Investors' response to the "OFFER" text message request that it received from Ms. Silva during the webinar. *Id.* ¶ 26.

Ms. Silva now brings suit against Connected Investors for the prerecorded voice message—a communication that she requested and consented to receiving.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings have closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Rule 12(c) motions are subject to nearly the same standard of review as motions to dismiss under Rule 12(b)(6). *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014). The deciding court tests the sufficiency of the complaint, *id.*, "assuming the facts alleged are true and drawing all reasonable factual inferences in favor of the non-moving party," *Affinity Living Group, LLC v. StarStone Specialty Ins. Co.*, 959 F.3d 634, 639 (4th Cir. 2020). The court does not need to accept legal conclusions or implausible inferences. *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021).

Unlike a motion to dismiss, however, a court deciding a motion for judgment on the pleadings may also consider the answer. *Mendenhall v Hanesbrands, Inc.*, 856 F. Supp. 2d 717, 724 (M.D.N.C. 2012). The answer's factual allegations

6

likewise are taken as true where "they have not been denied or do not conflict with those in the complaint." *Jennings v. Pereira*, No. 5:18-CT-3171-BO, 2020 WL 562090, at *2 (E.D.N.C. Feb. 4, 2020).

**ARGUMENT**

Connected Investors is entitled to judgment on the pleadings. Ms. Silva's Complaint fails to state a claim and, in light of the undisputable facts in her possession that she chose to omit, she is not entitled to any remedy. This is true for at least two reasons. ***First***, Ms. Silva consented to receiving communications from Connected Investors, and she requested that Connected Investors send her the particular communication that is at issue in this case. ***Second***, to the extent that Ms. Silva properly revoked her consent and terminated her requests for information, Connected Investors was entitled to have a reasonable time for processing her revocation and terminations before facing TCPA liability.

I. **Ms. Silva consented to receiving and specifically requested the prerecorded message from Connected Investors.**

Ms. Silva gave her express consent to receive telephone communications from Connected Investors when she registered for the webinar and when she requested information from Connected Investors three different times. The prerecorded voicemail that Ms. Silva received therefore did not violate the TCPA.

The TCPA was enacted "to prevent abusive telephone marketing practices." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 648 (4th Cir. 2019). It covers

7

conduct involving telephone calls, text messages, and faxes. 47 U.S.C. § 227(b)(1); *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016). The TCPA prohibits callers from, among other things, "using . . . an artificial or prerecorded voice" unless certain conditions are met. 47 U.S.C. § 227(b)(1)(A). In particular, callers must obtain "the prior express consent of the called party" before sending a prerecorded message to the called party's cell phone. 47 U.S.C. § 227(b)(1)(A)(iii).

The Federal Communications Commission's interpretation of "prior express consent" differs depending on whether the prerecorded message is telemarketing. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* (2012 FCC Ruling), 27 FCC Rcd. 1830, 1838 (2012). For prerecorded calls that are *not* telemarketing, there is not a "specific method by which a caller must obtain such prior express consent." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* (2015 FCC Ruling), 30 FCC Rcd. 7961, 7990 (2015). The called party may give her consent orally or in writing, or simply by providing her phone number to the caller. *Id.* at 7991–92; *Cartrette v. Time Warner Cable, Inc.*, 157 F. Supp. 3d 448, 453 (E.D.N.C. 2016). For prerecorded telemarketing calls, however, the FCC requires the caller to obtain express written consent before placing the call. 2012 FCC Ruling, 27 FCC Rcd. at 1838.

Through selective and conclusory pleading, Ms. Silva contends Connected Investors violated the TCPA by sending her a prerecorded telemarketing message without obtaining prior express written consent. But the Court is not required to

credit these allegations as true, as these allegations necessarily involve legal conclusions and otherwise are not plausible. Instead, it is apparent that the prerecorded message was not telemarketing and, regardless, Connected Investors obtained valid consent from Ms. Silva.

   *a. The prerecorded voicemail was not telemarketing.*

The prerecorded voice message that Ms. Silva received from Connected Investors did not constitute telemarketing. Under the TCPA and related regulations, a "telephone solicitation" or "telemarketing" is "a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(13), (15).[1] A call or message "does not count as a 'telephone solicitation' if the caller and the recipient have an established business relationship . . . or if the recipient invited the call." *Krakauer*, 925 F.3d at 649 (citing 47 U.S.C. § 227(a)(4)). After all, the TCPA "is not intended to disrupt communications that are expected or desired between businesses and their customers." 2015 FCC Ruling, 30 FCC Rcd. at 8016 (cleaned up).

Ms. Silva set off the chain of events at issue in this case when she registered for and participated in a webinar hosted by Connected Investors and when she

---

[1] Notably, "telemarketing" is defined by FCC regulation but not by the TCPA itself; the FCC gave it the same definition as "telephone solicitation," which is found in the TCPA. 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(13), (15). Courts use the two terms interchangeably. *E.g.*, *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649 (4th Cir. 2019).

submitted three requests for information from Connected Investors. (Ans., D.E. 11, ¶ 11). As to the second of those requests, participants were instructed to text in the word "OFFER" if they wanted to receive further information on offers from Connected Investors. *Id.* ¶ 26. Ms. Silva texted the word "OFFER" to Connected Investors. *Id.* Connected Investors sent her an automatic text reply that said, "Ross [Hamilton, the webinar presenter] received your request & will reach out soon!" *Id.* Connected Investors then followed through by sending her the prerecorded voice message that is at issue here. *Id.* The message provided Ms. Silva with the information she requested by directing her to visit a particular part of Connected Investors' website. (Compl., D.E. 1, ¶ 26). As the screen capture in Ms. Silva's Complaint shows, the webpage is tailored to Ms. Silva's "OFFER" request: it acknowledges "Everything Mentioned On The Webinar" and shows two different packages, each offered at a discounted price. *Id.*

In short, Ms. Silva invited the prerecorded message. She provided her contact information to Connected Investors and asked Connected Investors to provide her with further information about its services, which it did. Therefore, the message was not a telephone solicitation or telemarketing.

  b. *Connected Investors obtained prior express consent from Ms. Silva.*

Because the prerecorded message was not telemarketing, Connected Investors needed only to obtain Ms. Silva's consent in any reasonable form and was not limited to obtaining written consent. Connected Investors did so.

As stated above, callers must obtain "prior express consent" before sending a prerecorded message to a person's cell phone. 47 U.S.C. § 227(b)(1)(A)(iii). Neither the TCPA nor the FCC specifies the method by which a caller must obtain prior express consent; oral or written consent will suffice. 2015 FCC Ruling, 30 FCC Rcd. at 7990–92. Additionally, a person gives prior express consent when she provides her cell phone number to the caller. *Cartrette*, 157 F. Supp. 3d at 453; *see also In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991* (1992 FCC Order), 7 FCC Rcd. 8752, 8769 (1992) ("[A]ny telephone subscriber who releases his or her telephone number has, in effect, given prior express consent to be called by the entity to which the number was released."). As the Third Circuit Court of Appeals[2] has explained, "The voluntary provision of a number—phone or fax—by a message-recipient to a message-sender, constitutes express consent such that a received message is *solicited* and thus not prohibited by the TCPA, if the message relates to the reason the number was provided." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 619 (3d Cir. 2020). Similarly, the Second Circuit has noted that "the very act of turning over one's phone number demonstrates a willingness to be called about certain things." *Fober v. Mgmt. & Tech. Consultants, LLC*, 886 F.3d 789, 792–93 (2d Cir. 2018)); *see also Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1308 (11th Cir. 2015) ("By

---

[2] The Fourth Circuit Court of Appeals has not yet addressed this specific issue.

voluntarily providing his cell phone number to [defendant], [plaintiff] gave his prior express consent to be contacted.").

Ms. Silva gave prior express consent to receiving this prerecorded message several times over. When she registered for the webinar, she submitted a web form containing her phone number and agreeing that Connected Investors could contact her about its services. (Ans., D.E. 11, ¶ 29). Ms. Silva then requested information from Connected Investors three more times—twice by texting Connected Investors and then by submitting another web form containing her cell phone number. *Id.* One of the text requests was specifically tied to this prerecorded message. *Id.* ¶ 26.

Stated differently, Ms. Silva voluntarily provided her cell phone number to Connected Investors *four times*, thereby demonstrating a willingness to receive calls about Connected Investors' services. And she specifically solicited the prerecorded message by texting the word "OFFER" to Connected Investors. She therefore gave her prior express consent to be contacted by Connected Investors, and Connected Investors did not violate the TCPA.

> c. *Connected Investors also obtained prior express written consent from Ms. Silva.*

Even if the prerecorded message were telemarketing, Connected Investors nonetheless obtained valid consent from Ms. Silva in accordance with the TCPA and FCC regulations because Ms. Silva provided her consent in writing.

As discussed above, the FCC has concluded that for telemarketing calls using prerecorded voice messages, the caller must first obtain prior express written

consent. 2012 FCC Ruling, 27 FCC Rcd. at 1838; 47 C.F.R. § 64.1200(a)(2). To be valid, prior express written consent must "be sufficient to show that the consumer: (1) received 'clear and conspicuous disclosure' of the consequences of providing the requested consent . . . ; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates." 2012 FCC Ruling, 27 FCC Rcd. at 1844 (citing 16 C.F.R. § 310.4(b)(1)(A), now codified at 47 C.F.R. § 64.1200(f)(9)). The written consent must also be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service." *Id.*; 47 C.F.R. § 64.1200(f)(9). Lastly, the written consent must be signed by the called party. 2012 FCC Ruling, 27 FCC Rcd. at 1844; 47 C.F.R. § 64.1200(f)(9). Electronic formats, such as an email, website form, or text message, are acceptable manners for obtaining a written and signed consent. 2012 FCC Ruling, 27 FCC Rcd. at 1844.

Ms. Silva consented in writing to receive such calls from Connected Investors. In registering for the free webinar, Ms. Silva submitted a web form conspicuously and expressly agreeing that Connected Investors could use her information "to communicate with [her] regarding this event and their other services." (Ans., D.E. 11, ¶ 29). Ms. Silva provided her cell phone number and she signed the agreement by clicking the "Register" button on the web form. *Id.* Additionally, the agreement to receive calls from Connected Investors was not a condition of purchasing any good or service; the webinar was free to Ms. Silva. Connected Investors therefore

13

obtained prior express written consent from Ms. Silva to contact her on her cell phone regarding its services, in compliance with the TCPA.

In summary, despite Ms. Silva's conclusory and implausible allegations to the contrary, the prerecorded voicemail was not a telemarketing call, and Connected Investors obtained valid consent from Ms. Silva before sending the voicemail to her. Connected Investors therefore did not violate the TCPA and it is entitled to judgment in its favor.

**II.  Connected Investors was entitled to a reasonable time in which to comply with Ms. Silva's revocation of consent or termination of her information request.**

To the extent that Ms. Silva properly informed Connected Investors that she no longer desired to receive communications, Connected Investors still did not violate the TCPA when it sent the prerecorded voicemail. The TCPA allows callers a reasonable time to process and comply with consumers' opt-out requests. A reasonable time had not yet passed when the automated, prerecorded voicemail was sent to Ms. Silva in response to her request for information.

As this Court previously recognized, "The TCPA's consent requirement contained numerous gaps and ambiguities," including that the statute "did not specify . . . whether consent could be revoked." *Galbreath v. Time Warner Cable, Inc.*, 2015 WL 9450593, at *3 (E.D.N.C. Dec. 22, 2015). In response to this gap, the FCC concluded that despite the statute's silence, a consumer may revoke her consent. *Id.*; *see also* 2015 FCC Ruling, 30 FCC Rcd. at 7989–90. But because of

14

the TCPA's wholesale silence concerning revocation, there remains another unfilled gap in the statute: what a caller must do, and when, upon receiving a revocation in order to maintain compliance with the TCPA. Specifically, how quickly must a caller process and implement a revocation so as to maintain compliance with the TCPA?

The FCC has not yet answered this question, but other portions of the FCC's TCPA regulations are instructive. In relation to unsolicited advertisements sent by fax, senders must honor requests not to send future unsolicited advertisements "within the shortest reasonable time from the date of such request, not to exceed 30 days." 47 C.F.R. § 64.1200(a)(4)(v). Telemarketers likewise "must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made," again, not to exceed thirty days. 47 C.F.R. § 64.1200(d)(3). And package delivery companies must honor a package recipient's request to opt out of future delivery notifications "within a reasonable time from the date such request is made, not to exceed 30 days." 47 C.F.R. § 64.1200(a)(9)(i)(F). In light of these provisions, it follows that when a cell phone subscriber revokes her consent to, or terminates her request for, prerecorded messages, the caller must honor that request within a reasonable time, not to exceed thirty days.

Here, Ms. Silva received the prerecorded message at around 11:30 a.m. on March 31, 2021. (Ans., D.E. 11, ¶ 31). Barely thirty-six hours prior, at 11:19 p.m. on March 29, 2021, Ms. Silva allegedly sent an email asking Connected Investors

15

halt communications.³ (Compl., D.E. 1, ¶ 31). She also sent a "stop" text message to the automated webinar number just after 9 a.m. on March 31, 2021—*just two and a half hours* before the automated webinar number issued a response to Ms. Silva's information request. (Ans., D.E. 11, ¶ 31). Thirty-six hours, and certainly two and a half hours, is far from the FCC's outer "reasonableness" limit of thirty days. As a matter of law, "a reasonable time" had not passed between Ms. Silva's revocation and her receipt of the prerecorded voicemail. Finding otherwise would require Connected Investors and others like it to act immediately upon receiving a consent revocation, or else face liability. Requiring an instantaneous response, without an express statutory basis and in contradiction to the FCC's prior treatment of similar situations, would give Connected Investors a near-impossible and entirely unique burden that is not imposed on any other type of caller who has received an opt-out request under the TCPA.

Considering the TCPA's silence on consent revocation, it follows that the TCPA is equally silent as to requirements concerning the implementation of a consumer's revocation of consent. But the FCC has promulgated regulations for parallel scenarios that provide clear guidance here. Callers must honor consumers' opt-out requests, and therefore their consent revocations, within a reasonable time, not to exceed thirty days. It is plain that at the time that Ms. Silva received the

---

³ Connected Investors denies that it ever received this email, (Ans., D.E. 11, ¶ 31), but it understands that this allegation is accepted as true for the purposes of this Motion.

prerecorded voicemail here, a reasonable time had not passed from the time of her revocation. Connected Investors therefore did not violate the TCPA.

* * *

Ms. Silva should not be allowed to maintain her TCPA claim against Connected Investors. Through selective and conclusory pleading, she conveniently leaves out undisputable facts, known to both parties, concerning her communications with Connected Investors because they invalidate her claim. Ms. Silva provided her cell phone number to Connected Investors four times. She registered for a webinar and signed an agreement in which she consented to receiving messages from Connected Investors about its services. She participated in the webinar and then requested information from Connected Investors three times. She engaged in email and text conversations with Connected Investors about its services. Ms. Silva cannot now claim that she never provided consent to receive communications from Connected Investors. And she cannot argue that Connected Investors unreasonably delayed processing the revocation of her consent and the termination of her information request. In short, Ms. Silva cannot claim that Connected Investors engaged in the type of abusive telephone marketing practices that the TCPA seeks to prevent. Accordingly, Connected Investors is entitled to judgment on the pleadings.

## CONCLUSION

For the foregoing reasons, Defendant Connected Investors, Inc. prays that the Court grant its Motion for Judgment on the Pleadings.

This the 11th day of August, 2021.

>/s/Gary J. Rickner
> Gary J. Rickner
> N.C. State Bar I.D. No.:  25129
> email:  docket@wardandsmith.com
> email:  gjr@wardandsmith.com
> Jordan M. Spanner
> N.C. State Bar I.D. No.:  53622
> email:  jmspanner@wardandsmith.com
> For the firm of
> Ward and Smith, P.A.
> Post Office Box 33009
> Raleigh, NC  27636-3009
> Telephone:  919.277.9100
> Facsimile:  919.277.9177
> *Attorneys for Defendant*

CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2021, I electronically filed MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: David M. Wilkerson and Ignacio Hiraldo.

/s/Gary J. Rickner
Gary J. Rickner
N.C. State Bar I.D. No.: 025129
email: docket@wardandsmith.com
email: gjr@wardandsmith.com
For the firm of
Ward and Smith, P.A.
Post Office Box 33009
Raleigh, NC 27636-3009
Telephone: 919.277.9100
Facsimile: 919.277.9177
*Attorneys for Defendant*

ND: 4849-2543-5113, v. 2